## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NO. 0 8 - 0 6 9 |
| Plaintiff, | VIOLATION: 18 U.S.C. § 371 |
| v. | |
| VOLVO CONSTRUCTION EQUIPMENT, AB, | |
| Defendant. | |

MAR 2 0 2008

LEON, J. RJL

### INFORMATION

1.   The United States Department of Justice, Criminal Division, Fraud Section, charges that at all times material to this Information (unless otherwise specified):

### GENERAL ALLEGATIONS

*Relevant Entities and Individuals*

2.   VOLVO CONSTRUCTION EQUIPMENT, AB ("VCE"), the defendant, is the successor to Volvo Construction Equipment International, AB ("VCEI"). VCEI was headquartered in Eskilstuna, Sweden and was an international seller of heavy commercial construction equipment, including but not limited to excavators, haulers, wheel loaders, and motor graders.

3.   VCEI was a wholly-owned subsidiary of Aktiebolaget Volvo ("AB Volvo"), a company that had American Depositary Receipts ("ADRs") publicly traded on the National Association of Securities Dealers Automated Quotations ("NASDAQ"). AB Volvo issued and maintained a class of publicly-traded securities registered pursuant to Section 12(g) of the

Case Related To: CR 07-253 ( RJL)

Securities Exchange Act of 1934 (15 U.S.C. § 78l), and was required to file periodic reports with the United States Securities and Exchange Commission under Section 13 of the Securities Exchange Act (15 U.S.C. § 78m).  Accordingly, AB Volvo was an "issuer" within the meaning of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1(a).  By virtue of its status as an issuer within the meaning of the FCPA, AB Volvo was required to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and disposition of assets of AB Volvo and its subsidiaries, including those of VCEI which were incorporated into the books of AB Volvo.

4.      "Employee A," a citizen of Sweden, was employed as VCEI's Vice-President of Project Sales.

5.      "Company X" was a Jordanian company that acted as both an agent and distributor for VCEI in connection with sales made through the United Nations Oil-for-Food Program ("OFFP").

6.      "Company Y" was a Tunisian company that acted as a distributor for VCEI in connection with sales made through the OFFP.

*The United Nations Oil-for-Food Program*

7.      On or about August 6, 1990, days after Iraq's invasion of Kuwait, the United Nations ("U.N.") adopted Security Council Resolution 661, which prohibited U.N. member-states from transacting business with Iraq, except for the purchase and sale of humanitarian supplies.  Resolution 661 prohibited virtually all direct financial transactions with the government of Iraq.

8.      On or about April 15, 1995, the U.N. adopted Security Council Resolution 986, which served as a limited exception to the Iraq sanctions regime in that it allowed Iraq to sell its oil. However, Resolution 986 required that the proceeds from oil sales be used by the Iraqi government to purchase humanitarian supplies, including but not limited to food, for the Iraqi people. Hence, this program became known as the Oil for Food Program. Payments made to the Iraqi government which were not approved by the U.N. and which were outside the strict contours of the OFFP were prohibited.

9.      The rules of the OFFP required that the proceeds from all sales of Iraqi oil be deposited into a U.N.-controlled escrow account at the New York branch of Banque Nationale de Paris ("BNP-Paribas"). That escrow account funded the purchase of humanitarian goods by the Iraqi government.

10      Under the rules of the OFFP, a supplier of humanitarian goods contracted with a ministry or other department of the Iraqi government to sell goods to the government. Once that contract was finalized, the contract was submitted to a U.N. Committee ("the 661 Committee") which reviewed the contracts to ensure that their terms complied with all U.N. OFFP and Iraqi sanction regulations. The 661 Committee accepted the contracts, rejected them or asked the supplier to provide additional information upon which the committee could make a decision.

11.      If a contract was approved by the 661 Committee, a letter of credit was issued by the New York branch of BNP-Paribas to the supplier's bank stating that the supplier would be paid by the OFFP for the relevant goods once certain conditions were met, including delivery of the goods to Iraq and inspection of the goods by a U.N. contractor. Once those conditions were deemed by the U.N. to have been met, the U.N. would direct BNP-Paribas to release payment to the supplier.

12.    On or about December 10, 1996, the first Iraqi oil exports under the U.N. OFFP began.  The OFFP continued from in or about December 1996 until the United States invasion of Iraq on or about March 19, 2003.  From in or about December 1996 through March 2003, the United States government prohibited United States companies and individuals from engaging in transactions with the government of Iraq, unless such transactions were authorized by the U.N. pursuant to the OFFP.

13.    Beginning in approximately August 2000, the Iraqi government demanded that suppliers of humanitarian goods pay a kickback, usually valued at 10% of the contract price, to the Iraqi government in order to be awarded a contract by the government.  These kickbacks violated U.N. OFFP regulations and U.N. sanctions which prohibited payments to the Iraqi government which were not expressly approved by the U.N. and which were not contemplated by the guidelines of the OFFP.

14.    Often, these kickbacks were termed "after sales service fees" ("ASSFs"), but did not represent any actual service being performed by the supplier.  These ASSFs were usually included in the contract price submitted by the supplier to the U.N. without disclosing to the U.N. that the contract contained an extra 10% which would be returned to the Iraqi government. Including the 10% in the contract price allowed the supplier to avoid paying the 10% out of its profits; instead, the suppliers caused the U.N., unknowingly, to fund the kickbacks to the Iraqi government.

15.     Some suppliers labeled the ASSFs as such, thereby leading the U.N. to believe that actual after-sales services were being provided by the supplier.  Other suppliers disguised the ASSFs by inserting fictitious line items into the contracts for goods or services that were not being provided.  Still other suppliers simply inflated their contract prices by 10% to account for the payments they would make, or cause to be made, to the Iraqi government.

*VCEI's Kickback Scheme*

16.     From in or about December 2000 through in or about January 2003, VCEI and its distributors, Company X and Company Y, were awarded a total of approximately $13.8 million worth of contracts to supply various VCEI construction vehicles to the government of Iraq, pursuant to the OFFP.  To obtain these contracts, VCEI, Company X and Company Y paid approximately $1.3 million in kickbacks to the government of Iraq.

17.     VCEI entered into a direct contract with the Iraqi Ministry of Housing & Construction in December 2000 to provide wheel loaders to that ministry, and also entered into sales agreements with Company X and Company Y, knowing that Company X and Company Y would: (i) contract with the Iraqi government for the further sale of VCEI products; and (ii) pay kickbacks to the Iraqi government in exchange for those contracts.

18.     In order to generate the funds to pay the kickbacks to the Iraqi government and to conceal those payments, VCEI, Company X and Company Y each inflated the price of their contracts with the Iraqi government by 10% before submitting the contracts to the U.N. for approval.

19.     After the U.N. approved the contracts, BNP-Paribas issued letters of credit, via international wire communication, to banks used by VCEI, Company X and Company Y, in the amount of the contract price.  These letters of credit authorized VCEI, Company X and Company Y to be paid the amounts specified in the contracts, which included the 10% kickbacks to be paid to the Iraqi government.

## COUNT ONE
### (Conspiracy)

## THE CONSPIRACY AND ITS OBJECTS

20.     Paragraphs 1 through 19 of this Information are re-alleged and incorporated by reference as if set out in full.

21.     From in or about December 2000 through in or about January 2003, within the territory of the United States and elsewhere, VCEI, Employee A, Company X, Company Y, and others known and unknown, did unlawfully and knowingly combine, conspire, confederate and agree together to commit the following offenses against the United States:

a.      to knowingly devise, and intend to devise a scheme and artifice to defraud the U.N. and the Oil-for-Food Program, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, through the use of interstate and foreign wire communications, in violation of Title 18, United States Code, Section 1343; and

b.      to knowingly falsify and cause to be falsified books, records, and accounts required to, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of AB Volvo, an issuer within the meaning of the FCPA, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff(a), and Title 18, United States Code, Section 2.

## PURPOSE OF THE CONSPIRACY

22.     The primary purpose of the conspiracy was to obtain and retain lucrative business with the Iraqi government through the payment of kickbacks to the Iraqi government which were concealed from the U.N. and portrayed as legitimate charges.

## MANNER AND MEANS OF THE CONSPIRACY

23.     To achieve the objects of the conspiracy, VCEI and others used the following manner and means, among others:

a.     It was part of the conspiracy that VCEI agreed to pay kickbacks, and cause kickbacks to be paid, to the government of Iraq in exchange for contracts being awarded by the Iraqi government to VCEI, Company X and Company Y.

b.     It was a further part of the conspiracy that VCEI entered into sales agreements with Company X and Company Y while aware that Company X and Company Y would pay and conceal the kickbacks.

c.     It was a further part of the conspiracy that VCEI, Company X and Company Y submitted contracts to the U.N. for approval which failed to disclose, and concealed, the fact that the prices of the contracts had been inflated by 10% in order to generate money to pay the kickbacks to the Iraqi government.

d.     It was a further part of the conspiracy that VCEI, Company X and Company Y caused the transmission of international wire communications, to and from the United States: (i) to provide notice to the U.N. that VCEI goods had been shipped to, and inspected in, Iraq and (ii) to provide notice to banks used by VCEI, Company X and Company Y that the U.N. was authorizing payments pursuant to the contracts.

e.    It was a further part of the conspiracy that VCEI falsely described at least one of the kickbacks paid to the Iraqi government in its corporate books and records as "commission" payments.

## OVERT ACTS

24.    In furtherance of the conspiracy and to accomplish its unlawful objects, the following overt acts, among others, were committed within the territory of the United States and elsewhere:

*Contract 901216*

a.    On or about December 19, 2000, Employee A, on behalf of VCEI, executed a contract, referenced by the U.N. as Contract 901216, with the Iraqi Ministry of Housing & Construction to supply 35 VCEI wheel loaders and various spare parts for €6,665,315.30, which included an extra 10% to be used to pay a kickback to the Iraqi government through Company X.

b.    On or about January 19, 2001, VCEI sent a facsimile from Sweden to the 661 Committee in New York providing technical specifications regarding the VCEI wheel loaders which the Ministry of Housing & Construction had contracted to purchase.

c.    On or about November 22, 2001, with funds paid to Company X by VCEI, Company X made a kickback payment of $145,200 by wire transfer from Company X's bank account to the account of the Iraqi Ministry of Housing & Construction in Baghdad,  related to the first 10 wheel loaders purchased by the Iraqi government pursuant to Contract 901216.

d.    On or about February 3, 2002, with funds paid to Company X by VCEI, Company X made a kickback payment of €86,562 by wire transfer from its bank to the account for the Iraqi Ministry of Housing & Construction in Baghdad, related to the next 5 wheel loaders purchased pursuant to Contract 901216.

e.    On or about March 8, 2002, VCEI caused 22 wheel loaders to be delivered to Iraq, prompting a company based in Geneva, Switzerland, that provided commercial inspection services on behalf of the U.N. in Iraq ("the inspection company") to send a facsimile from Iraq to the U.N. in New York notifying the U.N. that VCEI products purchased pursuant to Contract 901216 had been received and inspected upon entry into Iraq; these notifications, in turn, triggered payment by the U.N. to VCEI for Contract 901216.

f.    On or about April 4 and April 7, 2002, with funds paid to Company X by VCEI, Company X made kickback payments totaling  €346,248 by wire transfer from its bank account to the account of the Iraqi Ministry of Housing & Construction in Baghdad,  related to the remaining wheel loaders purchased pursuant to Contract 901216.

*Contract 901289*

g.    On or about January 1, 2001, VCEI issued an "Authorization Announcement" stating that Company X was "authorized to bid and submit offers on our behalf, enter into contracts with Iraqi purchasers, supply spare parts to Iraq as well as handle all aftersales services."

h.    On or about May 28, 2001, Company X entered into a contract, referenced by the U.N. as Contract 901289, with the Iraqi Ministry of Transport & Communication General Establishment of Civil Aviation to supply 3 VCEI motor graders with spare parts for €478,523,

9

which included an extra 10% to be used to pay a kickback to the Iraqi government by Company X.

   i. On or about March 24, 2002, Company X agreed to pay the Iraqi government $46,810 in kickbacks, falsely described as "after sale services," in connection with Contract 901289.

   j. On or about August 29, 2002, Company X caused VCEI products purchased pursuant to Contract 901289 to be delivered to Iraq, prompting the inspection company to send a facsimile from Iraq to the U.N. in New York notifying the U.N. that the VCEI products had been received and inspected upon entry into Iraq; this notification, in turn, triggered payment by the U.N. to Company X for Contract 901289.

*Contract 1000400*

   k. On or about May 31, 2001, Company X entered into a contract, referenced by the U.N. as Contract 1000400, with the Iraqi Ministry of Housing & Construction Planning and Pursuance Office to supply 10 VCEI wheel loaders and spare parts for €2,103,996.90, which included an extra 10% to be used to pay a kickback to the Iraqi government by Company X.

   l. In or about March 2002, Company X paid the Iraqi government $163,884 in kickbacks in connection with Contract 1000400.

   m. On or about April 8, 2002, Company X caused VCEI products purchased pursuant to Contract 100400 to be delivered to Iraq, prompting the inspection company to send a facsimile from Iraq to the U.N. in New York notifying the U.N. that the VCEI products had been received and inspected upon entry into Iraq; this notification, in turn, triggered payment by the U.N. to Company X for Contract 1000400.

*Contract 1200002*

n.     On or about June 1, 2002, Company Y executed a contract, referenced by the U.N. as Contract 1200002, with the Iraqi Ministry of Irrigation to supply 40 VCEI motor graders with spare parts for €5,817,166.00, which included an extra 10% to be used to pay a kickback to the Iraqi government by Company Y.

o.     In or about November 2002, Company Y paid the Iraqi government $567,142 in kickbacks in connection with Contract 1200002.

p.     On or about January 22, 2003, Company Y caused VCEI products purchased pursuant to Contract 1200002 to be delivered to Iraq, prompting the inspection company to send a facsimile from Iraq to the U.N. in New York notifying the U.N. that the VCEI products had been received and inspected upon entry into Iraq; this notification, in turn, triggered payment by the U.N. to Company Y for Contract 1200002.

*Books and Records*

q.     In or about 2002, in order to conceal on its corporate books and records the €346,248 kickback payment made to the Iraqi government in connection with Contract 901216, VCEI improperly characterized the payment to Company X, part of which was to be paid to the Iraqi government, as a "commission" payment.

r.    At the end of AB Volvo's fiscal year 2002, the books and records of VCEI, including those containing false characterizations of the payments made to the Iraqi government, were incorporated into the books of AB Volvo for purposes of preparing AB Volvo's year-end financial statements.

(All in violation of Title 18 U.S.C. §371).

STEVEN A. TYRRELL
Chief, Fraud Section

By:

William B. Jacobson
Assistant Chief, Fraud Section
Criminal Division
U.S. Department of Justice
1400 New York Avenue, N.W.
Washington, D.C. 20005
(202) 514-7023



**U. S. Department of Justice**

Criminal Division

_Fraud Section_
_Bond Building, 4th Floor_
_1400 New York Ave., N.W._
_Washington, DC 20005_

0 8 - 0 6 9

March 18, 2008

CR 08-69 (RJL)

Mr. Danforth Newcomb
Shearman & Sterling, LLP
599 Lexington Avenue
New York, NY 10022

     _**Re: AB Volvo, et. al.**_

Dear Mr. Newcomb:

This letter sets out the agreement ("the Agreement") between Aktiebolaget Volvo ("AB Volvo") on behalf of itself and its wholly-owned subsidiaries, Renault Trucks SAS ("Renault Trucks") and Volvo Construction Equipment AB ("VCE") as successor to Volvo Construction Equipment International AB ("VCEI") and the United States Department of Justice, Criminal Division, Fraud Section ("the Department") relating to illegal conduct committed by Renault Trucks and VCEI in connection with certain U.N. Oil-For-Food contracts. The terms of the Agreement are as follows:

1.     **Relevant Parties**:  AB Volvo, by AB Volvo's undersigned attorneys, pursuant to authority granted by AB Volvo's Board of Directors, enters into this Agreement with the Department, which shall apply to AB Volvo, a Swedish corporation with its principal place of business in Gothenburg, Sweden, and all its affiliates and subsidiaries, including its wholly-owned subsidiaries Renault Trucks, a French corporation with its principal place of business in Lyon, France, and VCE, a Swedish corporation with its principal place of business in Eskilstuna, Sweden.

2.     **Charges**:  AB Volvo accepts and acknowledges that the United States will file two one-count Criminal Informations in the United States District Court for the District of Columbia. The first Information charges Renault Trucks with conspiracy to commit the following offenses against the United States, in violation of Title 18, United States Code, Section 371: (a) wire fraud, in violation of Title 18, United States Code, Section 1343; and (b) falsification of books and records of AB Volvo, in violation of the books and records provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5), and 78ff(a).  The second Information charges VCE with conspiracy to commit the following offenses against the United States, in violation of Title 18, United States Code, Section 371: (a) wire fraud, in violation of Title 18, United States Code, Section 1343; and (b) falsification of books and records of AB Volvo, in violation of the books and records

provisions of the FCPA, Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5), and 78ff(a).

3.    **Waiver of Rights**: AB Volvo on its own behalf and on behalf of Renault Trucks and VCE knowingly waives its right to indictment on the charges described in Paragraph 2 and contained in the Informations, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b). In addition, AB Volvo knowingly waives any objection based on venue to the filing of the Informations and the Agreement in the United States District Court for the District of Columbia.

4.    **Acceptance of Responsibility**: AB Volvo admits, accepts, and acknowledges that it is responsible for the acts of its officers, employees, agents and its wholly-owned subsidiaries, Renault Trucks and VCE, as set forth in the Statement of Facts attached to the Agreement as Appendix A. Should the Department initiate the prosecutions deferred by this Agreement, AB Volvo, Renault Trucks and VCE agree that they will neither contest the admissibility of, nor contradict, in any such proceeding, the facts contained in the Statement of Facts.

5.    **Monetary Penalty**: AB Volvo agrees, on behalf of itself and Renault Trucks and VCE, to pay a monetary penalty of $7,000,000 to the U.S. Treasury within ten (10) days of the execution of this Agreement. This amount is a final payment and shall not be refunded: (a) if the Department moves to dismiss the Informations pursuant to this Agreement; or (b) should the Department later determine that AB Volvo, Renault Trucks or VCE has breached this Agreement and brings a prosecution against Renault Trucks and/or VCE. Further, nothing in this Agreement shall be deemed an agreement by the Department that this amount is the maximum criminal fine that may be imposed in any such prosecution and the Department shall not be precluded in such a prosecution from arguing that the Court should impose a higher fine. The Department agrees, however, that in the event of a subsequent breach and prosecution, it will recommend to the Court that the amount paid pursuant to this Agreement should be offset against whatever fine the Court shall impose as part of its judgment. AB Volvo, Renault Trucks and VCE understand that such a recommendation will not be binding on the Court. AB Volvo, Renault Trucks and VCE acknowledge that no tax deduction may be sought in connection with the payment of this $7,000,000 penalty.

6.    **Basis for Agreement**: The Department enters into this Agreement based upon the following facts and circumstances: (a) AB Volvo conducted a thorough investigation of the criminal conduct described in the Statement of Facts and other possible misconduct; (b) AB Volvo promptly and thoroughly reported all of its findings to the Department; (c) AB Volvo cooperated in the Department's investigation of this matter; and (d) AB Volvo has undertaken, and has agreed to undertake, further remedial measures to ensure that this conduct will not recur.

7.    **Cooperation**: This Agreement shall be in effect for three years. During the three-year term of the Agreement, AB Volvo, Renault Trucks and VCE agree to cooperate fully with the Department and any other authority or agency, domestic or foreign, designated by the

2

Department, in any investigation of AB Volvo or any subsidiary thereof, including Renault Trucks and VCE, or any of their present and former directors, officers, employees, agents, consultants, contractors and subcontractors, or any other party, in any and all matters relating to corrupt payments in connection with the operations of AB Volvo or any subsidiary thereof, including Renault Trucks and VCE. AB Volvo, Renault Trucks and VCE agree that their cooperation shall include, but not be limited to, the following:

        a.      AB Volvo, Renault Trucks and VCE shall continue to cooperate fully with the Department, and with all other authorities and agencies designated by the Department, and shall truthfully disclose all information with respect to the activities of AB Volvo, Renault Trucks and VCE and their present and former subsidiaries and affiliates, and the directors, officers, employees, agents, consultants, contractors and subcontractors thereof, concerning all matters relating to corrupt payments in connection with their operations, related false books and records, and related inadequate internal controls about which AB Volvo, Renault Trucks and VCE have any knowledge or about which the Department shall inquire. This obligation of truthful disclosure includes the obligation of AB Volvo, Renault Trucks and VCE to provide to the Department, upon request, any document, record, or other tangible evidence relating to such corrupt payments, books and records, and internal controls about which the Department inquires of AB Volvo, Renault Trucks and VCE.

        i.      The Department specifically reserves the right to request that AB Volvo, Renault Trucks and VCE provide the Department with access to information, documents, records, facilities and/or employees that may be subject to a claim of attorney-client privilege and/or the attorney work-product doctrine.

        ii.      AB Volvo, Renault Trucks and VCE specifically reserve the right, upon written notice to the Department, to withhold access to information, documents, records, facilities and/or employees based upon an assertion of a valid claim of attorney-client privilege or application of the attorney work-product doctrine. Such notice shall include a general description of the nature of the information, documents, records, facilities and/or employees that are being withheld, as well as the basis for the claim.

        iii.      In the event that AB Volvo, Renault Trucks and VCE withhold access to the information, documents, records, facilities and/or employees, the Department may consider this fact in determining whether AB Volvo, Renault Trucks and VCE has fully cooperated with the Department.

        iv.      Except as provided in this paragraph, AB Volvo, Renault Trucks and VCE shall not withhold from the Department, access to any information, documents, records, facilities and/or employees on the basis of an attorney-client privilege or work product claim.

        b.      Upon request of the Department, with respect to any issue relevant to its investigation of corrupt payments and related false accounting and internal controls in connection with the operations of AB Volvo, Renault Trucks and VCE, or any of their present or

former subsidiaries or affiliates, AB Volvo, Renault Trucks and VCE shall designate knowledgeable employees, agents, or attorneys to provide to the Department the information and materials described in Paragraph 7(a) above, on behalf of AB Volvo, Renault Trucks and VCE. It is further understood AB Volvo, Renault Trucks and VCE must at all times provide complete, truthful, and accurate information.

c.    With respect to any issue relevant to the Department's investigation of corrupt payments and false accounting in connection with the operations of AB Volvo, Renault Trucks and VCE, or any of their present or former subsidiaries or affiliates, AB Volvo, Renault Trucks and VCE shall use their best efforts to make available for interviews or testimony, as requested by the Department, present or former directors, officers, employees, agents and consultants of AB Volvo, Renault Trucks and VCE, or any of their present or former subsidiaries or affiliates, as well as directors, officers, employees, agents and consultants of contractors and sub-contractors. This includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with federal law enforcement authorities. Cooperation under this paragraph will include identification of witnesses who, to the knowledge of AB Volvo, Renault Trucks and VCE, may have material information regarding the matters under investigation.

d.    With respect to any information, testimony, document, record, or other tangible evidence provided to the Department pursuant to this Agreement, AB Volvo, Renault Trucks and VCE consent to any and all disclosures to other government agencies, whether agencies of the United States or a foreign government, of such materials as the Department, in its sole discretion, shall deem appropriate.

8.    **Compliance Undertakings**: AB Volvo, Renault Trucks and VCE represent that they will adhere to the requirements of Appendix B hereto and that they have implemented and, where necessary and appropriate, will continue to implement a compliance and ethics program designed to detect and prevent violations of the FCPA and other applicable anti-corruption laws throughout their operations, including those of subsidiaries, affiliates, and, where necessary and appropriate, joint ventures and those of its contractors and subcontractors with responsibilities that include interactions with foreign officials. Implementation of these policies and procedures shall not be construed in any future enforcement proceeding as providing immunity or amnesty for any crimes not protected from prosecution by Paragraph 9 of this Agreement.

9.    **Government Commitments**: In return for the full and truthful cooperation of AB Volvo, Renault Trucks and VCE, and compliance with all the terms and conditions of this Agreement, the Department agrees as follows:

a.    The Department will not use any information in the attached Statement of Facts or information AB Volvo disclosed to the Department prior to the date of this Agreement concerning business activities in Iraq under the United Nations Oil for Food Program against AB Volvo or any subsidiary thereof, including Renault Trucks and VCE, in any criminal or civil case, except in a prosecution for perjury or obstruction of justice; in a prosecution for making a false statement; in a prosecution or other proceeding relating to any crime of violence; or in a

4

prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

b.  Except as provided in this Agreement, the Department will not bring any criminal or civil case based upon the conduct described in the attached Statement of Facts, or the conduct AB Volvo disclosed to the Department prior to the date of this Agreement concerning business activities in Iraq under the United Nations Oil for Food Program against AB Volvo or any subsidiary thereof, including Renault Trucks and VCE.  This paragraph does not provide any protection against prosecution for any corrupt payments or false accounting, if any, made in the future by AB Volvo or any subsidiary thereof, including Renault Trucks or VCE, or any directors, officers, employees, agents or consultants, whether or not disclosed by AB Volvo, Renault Trucks and VCE, pursuant to the terms of this Agreement.  This paragraph provides protection against prosecution only with regard to those corrupt payments made in the past in connection with the business activities of AB Volvo and any subsidiary thereof, including Renault Trucks and VCE, in Iraq that: (i) are described in the attached Statement of Facts; or (ii) were disclosed to the Department prior to the date of this Agreement.  This paragraph does not provide any protection against criminal prosecution of any present or former director, officer, employee, shareholder, agent, consultant, contractor, or subcontractor of AB Volvo or any subsidiary thereof, including Renault Trucks and VCE, for any violations committed by them.

c.  In consideration of the actions of AB Volvo in voluntarily conducting an investigation by outside legal counsel regarding the matters described in the attached Statement of Facts and other matters disclosed to the Department, the cooperation of AB Volvo with the investigation conducted by the Department, and the willingness of AB Volvo, Renault Trucks and VCE to: (i) acknowledge responsibility for their behavior and that of their subsidiaries, affiliates and agents; (ii) continue their cooperation with the Department; and (iii) adopt and maintain remedial measures and independently review and audit such measures, the Department agrees that any prosecution of Renault Trucks and VCE for the conduct set forth in the attached Statement of Facts, and for all other conduct AB Volvo disclosed to the Department prior to the date of this Agreement concerning its business activities in Iraq under the United Nations Oil For Food Program, be and hereby is deferred for a period of three (3) years from the date of this Agreement.

10.  **Terms of Dismissal**:  The Department further agrees that if at the end of the three-year term of this Agreement, AB Volvo, Renault Trucks and VCE are, and have been, in full compliance with all of their obligations under this Agreement, the Department will not continue the criminal prosecutions against Renault Trucks and VCE described in Paragraph 2, will move to dismiss the Informations, and this Agreement shall expire.

11.  **Breach of Agreement**:  If the Department determines, in its sole discretion, that AB Volvo, Renault Trucks and/or VCE, at any time during the three-year term of this Agreement, have committed any crime which would constitute a felony under federal law; have at any time provided deliberately false, incomplete, or misleading information to the Department; or have otherwise breached this Agreement, AB Volvo and its subsidiaries, including Renault Trucks and VCE, shall thereafter be subject to prosecution for any federal criminal violation of

which the Department has knowledge. Any such prosecution may be premised on information provided by AB Volvo, Renault Trucks and VCE. AB Volvo, Renault Trucks and VCE acknowledge that the Department has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if AB Volvo, Renault Trucks and/or VCE breaches this Agreement and this matter proceeds to judgment. AB Volvo, Renault Trucks and VCE further acknowledge that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of its discretion. In the event of a breach:

       a.    AB Volvo, Renault Trucks and VCE agree that any prosecution that is not time-barred by the applicable statute of limitations on the date of this Agreement may be commenced against AB Volvo or any subsidiary thereof, including Renault Trucks and VCE, in accordance with this Agreement, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the termination of this Agreement plus one year. Thus, by signing this agreement, AB Volvo, on behalf of itself and all of its subsidiaries, including Renault Trucks and VCE, agrees that the statute of limitations with respect to any prosecution that is not time-barred on the date of this Agreement shall be tolled for the term of this Agreement, plus one year. By this Agreement, AB Volvo, Renault Trucks and VCE expressly intend to and do waive any rights with respect to the statute of limitations discussed herein.

       b.    All statements made by or on behalf of AB Volvo, Renault Trucks and VCE to the Department or to the Court, including the attached Statement of Facts, and any testimony given by AB Volvo, Renault Trucks or VCE before a grand jury or any tribunal, at any legislative hearings, or to the Securities and Exchange Commission ("SEC"), whether prior or subsequent to this Agreement, or any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Department against AB Volvo, Renault Trucks and VCE, or one of them.

       c.    AB Volvo, Renault Trucks and VCE shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by or on behalf of AB Volvo, Renault Trucks and VCE prior or subsequent to this Agreement, or any leads derived there from, should be suppressed. The decision whether conduct or statements of any individual will be imputed to AB Volvo, Renault Trucks and VCE for the purpose of determining whether AB Volvo, Renault Trucks or VCE has violated any provision of this Agreement shall be in the sole discretion of the Department.

    12.    **Successor Liability**: AB Volvo, Renault Trucks and VCE agree that in the event they, during the term of this Agreement, sell, merge, or transfer all or substantially all of their business operations as they exist as of the date of this Agreement, whether such sale is structured as a stock or asset sale, merger, or transfer, they shall include in any contract for sale, merger or transfer a provision binding the purchaser or any successor in interest thereto to the obligations described in this Agreement.

13.   **Public Statements**:  AB Volvo, Renault Trucks and VCE expressly agree that they shall not, through present or future attorneys, directors, officers, or any other person authorized to speak for them, make any public statement, in litigation or otherwise, contradicting either the acceptance of responsibility by AB Volvo, Renault Trucks and VCE set forth above or any fact contained in the attached Statement of Facts.  Any such contradictory statement shall, subject to cure rights below by AB Volvo, Renault Trucks and VCE, constitute a breach of this Agreement and AB Volvo, Renault Trucks and VCE thereafter shall be subject to prosecution as set forth in Paragraph 11 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to AB Volvo, Renault Trucks or VCE for the purpose of determining whether they have breached this Agreement shall be in the sole discretion of the Department.  If the Department determines that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Department shall so notify AB Volvo, Renault Trucks and VCE and they may avoid a breach of this Agreement by publicly repudiating such statement(s) within five (5) business days after notification.  Consistent with the obligations of AB Volvo, Renault Trucks and VCE set forth above, AB Volvo, Renault Trucks and VCE shall be permitted to raise defenses and to assert affirmative claims in civil and regulatory proceedings and non-U.S. criminal proceedings relating to the matters set forth in the Statement of Facts.  This paragraph is not intended to apply to any statement made by any current or former employee of AB Volvo, Renault Trucks or VCE in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of AB Volvo, Renault Trucks or VCE.

14.    **Statements to the Media**:  In connection with this Agreement, AB Volvo, Renault Trucks and VCE shall only issue a press release if they first determine that the text of the release is acceptable to the Department.

15.    **Agreement Binding on Parties Only**:  It is understood that this Agreement is binding on AB Volvo and its subsidiaries, including Renault Trucks and VCE and the Department, but does not bind any other federal agencies, or any state or local law enforcement or regulatory agencies, although the Department will bring the cooperation of AB Volvo, Renault Trucks and VCE and their compliance with their obligations under this Agreement to the attention of such agencies and authorities if requested to do so by AB Volvo, Renault Trucks or VCE.

16.    **Complete Agreement**: This Agreement sets forth all the terms of the Agreement between AB Volvo and its subsidiaries, including Renault Trucks and VCE, and the Department. No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Department, the attorneys for AB Volvo, Renault Trucks and VCE, and a duly authorized representative of AB Volvo, Renault Trucks and VCE.

17. **Notice:** Any notice to AB Volvo under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service or registered or certified mail, in each case addressed to Eva Persson, General Counsel, AB Volvo, Dept. 60 VHK, SE-405 08 Gothenburg, Sweden and copied to Danforth Newcomb, Shearman & Sterling LLP, 599 Lexington Avenue, New York, New York 10022. Notice shall be effective upon actual receipt by AB Volvo. Notice to the Department shall be made to Mark F. Mendelsohn (or his successor), Deputy Chief, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue, N.W., Washington, D.C. 20005.

**AGREED:**

**FOR AB VOLVO, RENAULT TRUCKS AND VCE:**

DANFORTH NEWCOMB
Shearman & Sterling LLP
Counsel for AB Volvo

EVA PERSSON                STEFAN JOHNSSON
General Counsel            Senior Vice President
AB Volvo                   AB Volvo

**FOR THE DEPARTMENT OF JUSTICE:**

STEVEN A. TYRRELL
Chief, Fraud Section

By:    WILLIAM B. JACOBSON
Assistant Chief, Fraud Section

MARK F. MENDELSOHN
Deputy Chief, Fraud Section

Criminal Division
United States Department of Justice
1400 New York Avenue, N.W.
Washington, DC 20005

Filed at Washington, D.C., on this _27th_ day of _March_, 2008.

8

**OFFICER'S CERTIFICATE**

I have read this Agreement and carefully reviewed every part of it with counsel for Aktiebolaget Volvo ("AB Volvo"). I understand the terms of this Agreement and voluntarily agree, on behalf of AB Volvo, and its wholly-owned subsidiaries, Renault Trucks SAS ("Renault Trucks") and Volvo Construction Equipment AB ("VCE") as successor to Volvo Construction Equipment International AB ("VCEI"), to each of its terms. Before signing this Agreement, I consulted with counsel for AB Volvo. Counsel fully advised me of the rights of AB Volvo, Renault Trucks and VCE and of the consequences of entering into this Agreement.

I have carefully reviewed this Agreement with the Board of Directors of AB Volvo. I have advised and caused investigative and outside counsel for AB Volvo to advise the Board fully of the rights of AB Volvo, Renault Trucks and VCE, of possible defenses, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf AB Volvo, Renault Trucks and VCE, in any way to enter into this Agreement. I am also satisfied with counsel's representation in this matter. I certify that I am an officer of AB Volvo and that I and Stefan Johnsson, Senior Vice President of AB Volvo, have been duly authorized by AB Volvo to jointly execute this Agreement on behalf of AB Volvo, Renault Trucks and VCE.

Date: _March 18, 2008_          By _____
                                    Eva Persson
                                    General Counsel, Senior Vice-President and
                                    Secretary of the Board of Directors,
                                    Aktiebolaget Volvo

## CERTIFICATE OF COUNSEL

I am counsel for Aktiebolaget Volvo ("AB Volvo") in the matter covered by this Agreement. In connection with such representation, I have examined relevant documents and have discussed this Agreement with the Board of Directors. Based on my review of the foregoing materials and discussions, I am of the opinion that: (1) AB Volvo's representative has been duly authorized to enter into this Agreement on behalf of AB Volvo and its wholly-owned subsidiaries Renault Trucks SAS ("Renault Trucks") and Volvo Construction Equipment AB ("VCE"); and (2) this Agreement has been duly and validly authorized, executed, and delivered on behalf of AB Volvo, Renault Trucks and VCE and is a valid and binding obligation of AB Volvo, Renault Trucks and VCE. Further, I have carefully reviewed this Agreement with the Board of Directors and General Counsel of AB Volvo. I have fully advised them of the rights of AB Volvo, Renault Trucks and VCE, of possible defenses, and of the consequences of entering into this Agreement. To my knowledge, the decision by AB Volvo to enter into this Agreement is an informed and voluntary one.

Date: 3/18/08

Danforth Newcomb
Shearman & Sterling LLP
Counsel for Aktiebolaget Volvo

## **APPENDIX A**

## **STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Agreement (the "Agreement") between the United States Department of Justice (the "Department") and Aktiebolaget Volvo ("AB Volvo"), on behalf of itself and its wholly-owned subsidiaries Renault Trucks SAS ("Renault Trucks") and Volvo Construction Equipment AB ("VCE") as successor to Volvo Construction Equipment International AB ("VCEI"), and the parties hereby agree and stipulate that the following information is true and accurate. As set forth in Paragraph 4 of the Agreement, AB Volvo admits, accepts and acknowledges that it is responsible for the acts of its officers and employees, and those of its wholly-owned subsidiaries Renault Trucks and VCE that are set forth below. Should the Department initiate the prosecution that is deferred by the Agreement, AB Volvo, Renault Trucks and VCE agree that they will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. If this matter were to proceed to trial, the United States would prove beyond a reasonable doubt, by admissible evidence, the facts alleged in this Statement of Facts and the Criminal Informations to be filed against Renault Trucks and VCE. This evidence would establish the following:

## I.    **The United Nations Oil-for-Food Program**

1.    On or about August 6, 1990, days after Iraq's invasion of Kuwait, the United Nations ("U.N.") adopted Security Council Resolution 661, which prohibited U.N. member-states from transacting business with Iraq, except for the purchase and sale of humanitarian supplies. Resolution 661 prohibited virtually all direct financial transactions with the government of Iraq.

2.      On or about April 15, 1995, the U.N. adopted Security Council Resolution 986, which served as a limited exception to the Iraq sanctions regime in that it allowed Iraq to sell its oil.  However,  Resolution 986 required that the proceeds from oil sales be used by the Iraqi government to purchase humanitarian supplies, including but not limited to food, for the Iraqi people.  Hence, this program became known as the Oil for Food Program ("OFFP").  Payments made to the Iraqi government which were not approved by the U.N. and which were outside the strict contours of the OFFP were prohibited.

3.      The rules of the OFFP required that the proceeds from all sales of Iraqi oil be deposited into a U.N.-controlled escrow account at the New York branch of Banque Nationale de Paris ("BNP-Paribas").  That escrow account funded the purchase of humanitarian goods by the Iraqi government.

4.      Under the rules of the OFFP, a supplier of humanitarian goods contracted with a ministry or other department of the Iraqi government to sell goods to the government.  Once that contract was finalized, the contract was submitted to a U.N. Committee ("the 661 Committee") which reviewed the contracts  to ensure that their terms complied with all U.N. OFFP and Iraqi sanction regulations.  The 661 Committee accepted the contracts, rejected them or asked the supplier to provide additional information upon which the committee could make a decision.

5.      If a contract was approved by the 661 Committee, a letter of credit was issued by the New York branch of BNP-Paribas to the supplier's bank stating that the supplier would be paid by the OFFP for the relevant goods once certain conditions were met, including delivery of the goods to Iraq and inspection of the goods by a U.N. contractor.  Once those conditions were

deemed by the U.N. to have been met, the U.N. would direct BNP-Paribas to release payment to the supplier.

6.    On or about December 10, 1996, the first Iraqi oil exports under the U.N. OFFP began. The OFFP continued from in or about December 1996 until the United States invasion of Iraq on or about March 19, 2003. From in or about December 1996 through March 2003, the United States government prohibited United States companies and individuals from engaging in transactions with the government of Iraq, unless such transactions were authorized by the U.N. pursuant to the OFFP.

7.    Beginning in approximately August 2000, the Iraqi government demanded that suppliers of humanitarian goods pay a kickback, usually valued at 10% of the contract price, to the Iraqi government in order to be awarded a contract by the government. These kickbacks violated U.N. OFFP regulations and U.N. sanctions which prohibited payments to the Iraqi government which were not expressly approved by the U.N. and which were not contemplated by the guidelines of the OFFP.

8.    Often, these kickbacks were termed "after sales service fees" ("ASSFs"), but did not represent any actual service being performed by the supplier. These ASSFs were usually included in the contract price submitted by the supplier to the U.N. without disclosing to the U.N. that the contract contained an extra 10% which would be returned to the Iraqi government. Including the 10% in the contract price allowed the supplier to avoid paying the 10% out of its profits; instead, the suppliers caused the U.N., unknowingly, to fund the kickbacks to the Iraqi government.

3

9.    Some suppliers labeled the ASSFs as such, thereby leading the U.N. to believe that actual after-sales services were being provided by the supplier.  Other suppliers disguised the ASSFs by inserting fictitious line items into the contracts for goods or services that were not being provided.  Still other suppliers simply inflated their contract prices by 10% to account for the payments they would make, or cause to be made, to the Iraqi government.

## II.    Volvo Construction Equipment, AB

### *Relevant Entities and Individuals*

10.    VOLVO CONSTRUCTION EQUIPMENT, AB ("VCE"), is the successor to Volvo Construction Equipment International, AB ("VCEI").  VCEI was headquartered in Eskilstuna, Sweden and was an international seller of heavy commercial construction equipment, including but not limited to excavators, haulers, wheel loaders, and motor graders.

11.    VCEI was a wholly-owned subsidiary of Aktiebolaget Volvo ("AB Volvo"), a company that had American Depositary Receipts ("ADRs") publicly traded on the National Association of Securities Dealers Automated Quotations ("NASDAQ").  AB Volvo issued and maintained a class of publicly-traded securities registered pursuant to Section 12(g) of the Securities Exchange Act of 1934 (15 U.S.C. § 78l), and was required to file periodic reports with the United States Securities and Exchange Commission under Section 13 of the Securities Exchange Act (15 U.S.C. § 78m).  Accordingly, AB Volvo was an "issuer" within the meaning of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1(a).  By virtue of its status as an issuer within the meaning of the FCPA, AB Volvo was required to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions

and disposition of assets of AB Volvo and its subsidiaries, including those of VCEI which were incorporated into the books of AB Volvo.

12.     "Employee A," a citizen of Sweden, was employed as VCEI's Vice-President of Project Sales.

13.     "Company X" was a Jordanian company that acted as both an agent and distributor for VCEI in connection with sales made through the OFFP.

14.     "Company Y" was a Tunisian company that acted as a distributor for VCEI in connection with sales made through the OFFP.

*VCEI's Kickback Scheme*

15.     From in or about December 2000 through in or about January 2003, VCEI and its distributors, Company X and Company Y, were awarded a total of approximately $13.8 million worth of contracts to supply various VCEI construction vehicles to the government of Iraq, pursuant to the OFFP.  To obtain these contracts, VCEI, Company X and Company Y paid approximately $1.3 million in kickbacks to the government of Iraq.

16.     VCEI entered into a direct contract with the Iraqi Ministry of Housing & Construction in December 2000 to provide wheel loaders to that ministry, and also entered into sales agreements with Company X and Company Y, knowing that Company X and Company Y would: (i) contract with the Iraqi government for the further sale of VCEI products; and (ii) pay kickbacks to the Iraqi government in exchange for those contracts.

17.     In order to generate the funds to pay the kickbacks to the Iraqi government and to conceal those payments, VCEI, Company X and Company Y each inflated the price of their contracts with the Iraqi government by 10% before submitting the contracts to the U.N. for approval.

5

18.     After the U.N. approved the contracts, BNP-Paribas issued letters of credit, via international wire communication, to banks used by VCEI, Company X and Company Y, in the amount of the contract price. These letters of credit authorized VCEI, Company X and Company Y to be paid the amounts specified in the contracts, which included the 10% kickbacks to be paid to the Iraqi government.

*Contract 901216*

19.     On or about December 19, 2000, Employee A, on behalf of VCEI, executed a contract, referenced by the U.N. as Contract 901216, with the Iraqi Ministry of Housing & Construction to supply 35 VCEI wheel loaders and various spare parts for €6,665,315.30, which included an extra 10% to be used to pay a kickback to the Iraqi government through Company X.

20.     On or about January 19, 2001, VCEI sent a facsimile from Sweden to the 661 Committee in New York providing technical specifications regarding the VCEI wheel loaders which the Ministry of Housing & Construction had contracted to purchase.

21.     On or about November 22, 2001, with funds paid to Company X by VCEI, Company X made a kickback payment of $145,200 by wire transfer from Company X's bank account to the account of the Iraqi Ministry of Housing & Construction in Baghdad, related to the first 10 wheel loaders purchased by the Iraqi government pursuant to Contract 901216.

22.     On or about February 3, 2002, with funds paid to Company X by VCEI, Company X made a kickback payment of €86,562 by wire transfer from its bank to the account for the Iraqi Ministry of Housing & Construction in Baghdad, related to the next 5 wheel loaders purchased pursuant to Contract 901216.

23.     On or about March 8, 2002, VCEI caused 22 wheel loaders to be delivered to Iraq, prompting a company based in Geneva, Switzerland, that provided commercial inspection

6

services on behalf of the U.N. in Iraq ("the inspection company") to send a facsimile from Iraq to the U.N. in New York notifying the U.N. that VCEI products purchased pursuant to Contract 901216 had been received and inspected upon entry into Iraq; these notifications, in turn, triggered payment by the U.N. to VCEI for Contract 901216.

24.    On or about April 4 and April 7, 2002, with funds paid to Company X by VCEI, Company X made kickback payments totaling €346,248 by wire transfer from its bank account to the account of the Iraqi Ministry of Housing & Construction in Baghdad, related to the remaining wheel loaders purchased pursuant to Contract 901216.

*Contract 901289*

25.    On or about January 1, 2001, VCEI issued an "Authorization Announcement" stating that Company X was "authorized to bid and submit offers on our behalf, enter into contracts with Iraqi purchasers, supply spare parts to Iraq as well as handle all aftersales services."

26.    On or about May 28, 2001, Company X entered into a contract, referenced by the U.N. as Contract 901289, with the Iraqi Ministry of Transport & Communication General Establishment of Civil Aviation to supply 3 VCEI motor graders with spare parts for €478,523, which included an extra 10% to be used to pay a kickback to the Iraqi government by Company X.

27.    On or about March 24, 2002, Company X agreed to pay the Iraqi government $46,810 in kickbacks, falsely described as "after sale services," in connection with Contract 901289.

28.    On or about August 29, 2002, Company X caused VCEI products purchased pursuant to Contract 901289 to be delivered to Iraq, prompting the inspection company to send a

7

facsimile from Iraq to the U.N. in New York notifying the U.N. that the VCEI products had been received and inspected upon entry into Iraq; this notification, in turn, triggered payment by the U.N. to Company X for Contract 901289.

*Contract 1000400*

29.    On or about May 31, 2001, Company X entered into a contract, referenced by the U.N. as Contract 1000400, with the Iraqi Ministry of Housing & Construction Planning and Pursuance Office to supply 10 VCEI wheel loaders and spare parts for €2,103,996.90, which included an extra 10% to be used to pay a kickback to the Iraqi government by Company X.

30.    In or about March 2002, Company X paid the Iraqi government $163,884 in kickbacks in connection with Contract 1000400.

31.    On or about April 8, 2002, Company X caused VCEI products purchased pursuant to Contract 100400 to be delivered to Iraq, prompting the inspection company to send a facsimile from Iraq to the U.N. in New York notifying the U.N. that the VCEI products had been received and inspected upon entry into Iraq; this notification, in turn, triggered payment by the U.N. to Company X for Contract 1000400.

*Contract 1200002*

32.    On or about June 1, 2002, Company Y executed a contract, referenced by the U.N. as Contract 1200002, with the Iraqi Ministry of Irrigation to supply 40 VCEI motor graders with spare parts for €5,817,166.00, which included an extra 10% to be used to pay a kickback to the Iraqi government by Company Y.

33.    In or about November 2002, Company Y paid the Iraqi government $567,142 in kickbacks in connection with Contract 1200002.

8

34.    On or about January 22, 2003, Company Y caused VCEI products purchased pursuant to Contract 1200002 to be delivered to Iraq, prompting the inspection company to send a facsimile from Iraq to the U.N. in New York notifying the U.N. that the VCEI products had been received and inspected upon entry into Iraq; this notification, in turn, triggered payment by the U.N. to Company Y for Contract 1200002.

*Books and Records*

35.    In or about 2002, in order to conceal on its corporate books and records the €346,248 kickback payment made to the Iraqi government in connection with Contract 901216, VCEI improperly characterized the payment to Company X, part of which was to be paid to the Iraqi government, as a "commission" payment.

36.    At the end of AB Volvo's fiscal year 2002, the books and records of VCEI, including those containing false characterizations of the payments made to the Iraqi government, were incorporated into the books of AB Volvo for purposes of preparing AB Volvo's year-end financial statements.

## III.    Renault Trucks SAS

*Relevant Entities and Individuals*

37.    RENAULT TRUCKS SAS ("Renault Trucks"), was headquartered in Lyon, France and was an international manufacturer of a diverse variety of trucks.

38.    Beginning on or about January 2, 2001, Renault Trucks was a wholly-owned subsidiary of AB Volvo. By virtue of its status as an issuer within the meaning of the FCPA, AB Volvo was required to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and disposition of assets of AB Volvo and its

9

subsidiaries, including those of Renault Trucks, which were incorporated into the books of AB Volvo.

39.    "Employee A," a French citizen, was employed as a Renault Trucks office manager in Baghdad.

40.    "Employee B," a French citizen, was employed as the Renault Trucks Area Manager for Iraq and Jordan.

41.    "Employee C," a French citizen, was employed as a Renault Trucks Commercial Assistant for the Middle East.

42.    "Company X" was a Swiss "bodybuilder," a company that outfitted the chassis and cabs produced by Renault Trucks and helped tailor the trucks to the buyer's specifications.

*Renault Trucks' Kickback Scheme*

43.    From in or about November 2000 through in or about April 2003, Renault Trucks obtained approximately €61 million worth of contracts with various ministries of the government of the Republic of Iraq to supply several types of Renault Trucks vehicles and other equipment, pursuant to the OFFP.   To obtain these contracts, Renault Trucks paid and agreed to pay approximately $4.8 million in kickbacks to the government of Iraq.

44.    In order to generate funds to pay the kickbacks to the Iraqi government, and to conceal those payments, Renault Trucks inflated the price of the contracts by approximately 10% before submitting them to the U.N. for approval.

45.    After the U.N. approved the Renault Trucks contracts, BNP-Paribas issued letters of credit, via international wire communications, to banks used by Renault Trucks.  These letters of credit authorized Renault Trucks to be paid the amount specified in the contracts, which included the 10% kickbacks to be paid to the Iraqi government.

10

46.     In order to pay the 10% kickbacks to the Iraqi government, in some cases, Renault Trucks paid Company X and other bodybuilders inflated prices for their work.  The bodybuilders, in turn, used the excess funds to pay the kickbacks to the Iraqi government on behalf of Renault Trucks.

47.     From in or about November 2000 through in or about April 2003, Renault Trucks entered into, and performed, at least 17 separate contracts with various Iraqi ministries.

*Contract 801294*

48.     On or about November 16, 2000, Employee A, on behalf of Renault Trucks, executed a contract, referenced by the U.N. as Contract 801294, with General Automobile and Machinery Company ("GAMCO"), a state-owned company which was a part of the Iraqi Ministry of Trade, to supply 60 Renault Trucks tractors with fuel tanker semi-trailers and spare parts for €7,420,038.73, which included an extra 10% to be used to pay a kickback to the Iraqi government.

49.     On or about January 29, 2001, Employee B sent a facsimile to Company X attaching the specifications required for Contract 801294 and stating: "As far as the fees for the 'after-sales' are concerned, the amount is EUR 674,580."

50.     On or about January 30, 2001, Company X sent a facsimile to Employee C confirming that Company X would supply the semi-trailers required for Contract 801294.

51.     On or about October 18, 2001, Employee A sent GAMCO a letter informing GAMCO of the upcoming shipment of the first lot of tractors and semi-trailers and noting that the "After Sales Service" fee for these products was €674,580.

11

52.     In or about October 2001, Renault Trucks caused Company X to pay the Iraqi government approximately €674,580 in kickbacks, falsely described as ASSFs, in connection with Contract 801294.

53.     On or about October 26, 2001, Renault Trucks caused some of its products purchased pursuant to Contract 801294 to be delivered to Iraq, prompting the inspection company to send a facsimile from Iraq to the U.N. in New York notifying the U.N. that the products had been received and inspected upon entry into Iraq; this notification, in turn, triggered payment by the U.N. to Renault Trucks for Contract 801294.

54.     On or about November 3, 2001, Employee A sent GAMCO a letter informing GAMCO of the upcoming shipment of the second lot of tractors and semi-trailers and again noted that the "After Sales Service" fee for these products was €674,580.

55.     Continuing until May 16, 2002, Renault Trucks caused the remainder of its products purchased pursuant to Contract 801294 to be delivered to Iraq, prompting the inspection company to send several facsimiles from Iraq to the U.N. in New York notifying the U.N. that the products had been received and inspected upon entry into Iraq; these notifications, in turn, triggered further payments by the U.N. to Renault Trucks for Contract 801294.

*Sixteen Additional Contracts*

56.     In addition to Contract 801294, between in or about November 2000 and in or about July 2001, Renault Trucks entered into at least 16 other contracts with the Iraqi government in return for which Renault Trucks caused its bodybuilders and others to pay kickbacks to the Iraqi government on behalf of Renault Trucks.  The total value of the kickbacks paid to the Iraqi government in connection with these 16 contracts was approximately $4.19

12

million.  These contracts were executed, and the kickback payments were made, on or about the

dates specified below:

| Contract Number | Date of Execution | Buyer | Contract Value | Items Purchased | Kickback Paid |
|---|---|---|---|---|---|
| 801190 | November 16, 2000 | GAMCO | € 22,137,894.83 | 290 Renault Trucks truck tractors with spare parts | $1,708,171 |
| 801192 | November 16, 2000 | GAMCO | € 9,769,784.24 | 100 tipper trucks with spare parts | $753,841 |
| 801295 | November 16, 2000 | GAMCO | € 7,027,295.51 | 100 Renault Trucks trucks for cargo | $542,230 |
| 801188 | November 16, 2000 | GAMCO | € 2,243,226.09 | 12 Renault Trucks vehicles with recovery equipment and spare parts | $173,088 |
| 801283 | November 16, 2000 | GAMCO | € 533,949.03 | 13 Renault cargo trucks trucks and spare parts | $41,200 |
| 801502 | December 2000 | GAMCO | € 876,868.56 | 10 Renault trucks with cranes and spare parts | $70,337 |
| 801501 | December 7, 2000 | GAMCO | € 3,544,783.50 | 40 Renault Trucks vehicles with cranes and spare parts | $284,341 |
| 801905 | December 14, 2000 | Ministry of Higher Education and Scientific Research | € 677,557.11 | 7 Renault water tankers and spare parts | $53,444 |
| 802342 | February 27, 2001 | State Company of Baghdad Electricity Distribution, Commission of Electricity | € 1,481,040.00 | 8 drinking water tankers and 8 fuel tankers with spare parts | $121,507 |
| 1000465 | April 12, 2001 | GAMCO | € 3,324,897.38 | 50 Renault truck chassis with cargo body and spare parts | $253,036 |

| Contract Number | Date of Execution | Buyer | Contract Value | Items Purchased | Kickback Paid |
|---|---|---|---|---|---|
| 900947 | April 21, 2001 | State Company of Iraqi Airways, Ministry of Transport and Communication | € 211,060 | 4 Renault Trucks lightening vehicles with spare parts | $17,150 |
| 900948 | April 21, 2001 | State Company of Iraqi Airways, Ministry of Transport and Communication | € 354,401 | 4 Renault Trucks garbage collection vehicles with spare parts | $28,797 |
| 900949 | April 21, 2001 | State Company of Iraqi Airways, Ministry of Transport and Communication | € 579,006.00 | 4 Renault Trucks aerial platform vehicles with spare parts | $47,048 |
| 930319 | June 1, 2001 | Economics and Finance Department of the Ministry of Oil | € 309,276.24 | Spare parts for Renault trucks | $23,603 |
| 830591 | June 3, 2001 | Economics and Finance Department of the Ministry of Oil | € 557,625.20 | Spare parts for various types of truck tractors | $42,556 |
| 930506 | July 26, 2001 | Economics and Finance Department of the Ministry of Oil | € 330,258 | Spare parts for vehicles and equipment | $26,158 |

*Books and Records*

57.     From in or about 2000 through in or about 2003, Renault Trucks mischaracterized its payments of kickbacks to the Iraqi government on its books and records as payments to bodybuilders when Renault Trucks was aware that a substantial portion of the money it had paid

14

to the bodybuilders was being passed on to the Iraqi government in exchange for being awarded contracts with the Iraqi government.

58.     At the end of AB Volvo's fiscal year, in 2001 and 2002, the books and records of Renault Trucks, including those containing false characterizations of the payments given to the Iraqi government, were incorporated into the books of AB Volvo for purposes of preparing AB Volvo's year-end financial statements.

**APPENDIX B**

In order to address potential deficiencies in AB Volvo's internal controls, policies and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.*, and other applicable anti-corruption laws, AB Volvo and its subsidiaries and affiliates (collectively, "AB Volvo") agree to conduct, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal controls, policies and procedures.

Where necessary and appropriate, AB Volvo agrees to adopt new or modify existing internal controls, policies and procedures in order to ensure that it maintains:  (a) a system of internal accounting controls designed to ensure that AB Volvo makes and keeps fair and accurate books, records and accounts; and (b) a rigorous anti-corruption compliance code, standards and procedures designed to detect and deter violations of the FCPA and other applicable anti-corruption laws.  At a minimum, this should include, but ought not be limited to, the following elements:

1.      A clearly articulated corporate policy against violations of the FCPA and other applicable anti-corruption laws;

2.      A system of financial and accounting procedures, including a system of internal accounting controls, designed to ensure the maintenance of fair and accurate books, records and accounts;

3.      Promulgation of a compliance code, standards and procedures designed to reduce the prospect of violations of the FCPA, other applicable anti-corruption laws, and AB Volvo's compliance code.  These standards and procedures should apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of AB Volvo

16

in a foreign jurisdiction, including agents, consultants, representatives, distributors, teaming partners, and joint venture partners (collectively referred to as "agents and business partners").

4.    The assignment of one or more senior corporate officials of AB Volvo to the implementation and oversight of compliance with policies, standards and procedures regarding the FCPA and other applicable anti-corruption laws.  Such corporate official(s) shall have the authority to report matters directly to the Audit Committee of the Board of Directors of AB Volvo.

5.    Mechanisms designed to ensure that AB Volvo's policies, standards and procedures regarding the FCPA and other applicable anti-corruption laws are effectively communicated to all directors, officers, employees and, where necessary and appropriate, agents and business partners.  This should include:  (a) periodic training for all directors and officers, and, where necessary and appropriate, employees, agents and business partners; and (b) annual certifications with regard to this training by all directors and officers, and, where necessary and appropriate, employees, agents and business partners.

6.    An effective system for reporting suspected criminal conduct and/or violations of the compliance policies, standards, and procedures regarding the FCPA and other applicable anticorruption laws for directors, officers, employees, and, where necessary and appropriate, agents and business partners.

7.    Appropriate disciplinary procedures to address, among other things, violations of the FCPA, other applicable anti-corruption laws, and AB Volvo's compliance code, standards and procedures by AB Volvo's directors, officers, and employees.

8.    Appropriate due diligence requirements pertaining to the retention and oversight of agents and business partners.

17

9.      Where necessary and appropriate, standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the FCPA and other applicable anti-corruption laws, which may, depending upon the circumstances, include:  (a) anticorruption representations and undertakings relating to compliance with the FCPA and other applicable anti-corruption laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any violation of anti-corruption laws or breach of representations and undertakings related to such matters.